No. 15-1760

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

**CLARK MATERIAL HANDLING CO.,**

*Plaintiff-Appellee*,

*v.*

**TOYOTA MATERIAL HANDLING U.S.A., INC.,**

*Defendant-Appellant*.

———————————————

**Appeal from the United States District Court
for the Western District of North Carolina**
*The Honorable Max O. Cogburn, Jr., District Judge*

———————————————

**PAGE-PROOF BRIEF OF APPELLANT
TOYOTA MATERIAL HANDLING U.S.A., INC.**

———————————————

Adam H. Charnes
KILPATRICK TOWNSEND
  & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101
(336) 607-7382

Thurston H. Webb
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree St. NE
Suite 2800
Atlanta, GA 30309
(404) 815-4528

John R. Maley
BARNES &
  THORNBURG LLP
11 S. Meridian Street
Indianapolis, IN 46204
(317) 231-7464

*Counsel for Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>
### (Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)

Appellant Toyota Material Handling U.S.A., Inc. makes the following disclosures:

1. Is Appellant a publicly held corporation or other publicly held entity?  ☐ YES  ☑ NO

2. Does Appellant have any parent corporations?  ☑ YES  ☐ NO

    Toyota Industries North America, Inc. ("TINA") owns 100% of Toyota Material Handling U.S.A.  Toyota Industries Corporation ("TICO") owns 100% of TINA.  TICO is a publicly held Japanese corporation.

3. Is 10% or more of the stock of Appellant owned by a publicly held corporation or other publicly held entity?  ☐ YES  ☑ NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑ YES  ☐ NO

    Toyota Industries Corporation

5. Is Appellant a trade association?  ☐ YES  ☑ NO

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES  ☑ NO

s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300

*Counsel for Appellant*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE...................................................................5

    1.    The Parties. ...........................................................................5

    2.    Clark Looks for a New Dealer in North Carolina, South
        Carolina, and Georgia. ........................................................6

    3.    SIE and Clark Explore the Potential of Entering into a Dealer
        Agreement. ............................................................................8

    4.    The May 17, 2012 Draft Dealer Sales Agreement..............9

    5.    The July 10, 2012 Draft Dealer Sales Agreement. ............14

    6.    SIE Decides Not to Represent Clark.................................15

    7.    Thorne Fails to Inform Clark that SIE Will Not Represent It.............16

    8.    SIE's Communications with Toyota. .................................17

    9.    The Litigation. ....................................................................19

SUMMARY OF THE ARGUMENT .....................................................23

ARGUMENT ........................................................................................26

    I.    THE DISTRICT COURT ERRONEOUSLY RULED THAT A
        CONTRACT EXISTED BETWEEN CLARK AND SIE AS A
        MATTER OF LAW. ..........................................................26

        A.    There Was Sufficient Evidence For a Reasonable Jury to
            Find that the May 17 Draft Was Not an Enforceable
            Contract. ........................................................................27

            1.    There Was Sufficient Evidence that the Modified
                May 17 Draft Did Not Represent a Meeting of the
                Minds on the Essential Term of the Quantity of
                Clark Products that SIE Would Purchase.......................30

            2.    There Was Sufficient Evidence that the Modified
                May 17 Draft Did Not Represent a Meeting of the

Minds on the Price of the Clark Products SIE Would Purchase From Clark. ..........................................35

3.  There Was Sufficient Evidence that the Modified May 17 Draft Did Not Represent a Meeting of the Minds on the Geographic Areas in Which SIE Was Allowed to Sell Clark Products. .....................................36

B.  The Erroneous Rule 50(a) Order Requires a New Trial on All Issues. ...................................................................................38

II.  THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THORNE'S DRAFT DECLARATION.....................42

A.  Thorne's Edits to the Draft Declaration Are Inadmissible Hearsay........................................................................................43

B.  Admission of this Inadmissible Hearsay Substantially Prejudiced Toyota. ...................................................................47

III.  THE DISTRICT COURT'S JURY INSTRUCTION ON CLARK'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE INCORRECTLY STATED THE LAW...............................................50

IV.  THE DISTRICT COURT ABUSED ITS DISCRETION IN ALLOWING SPECULATIVE, UNSUPPORTED DAMAGES PROJECTIONS CONTRARY TO RULE 702 AND DAUBERT. ...........................................................................................55

CONCLUSION ........................................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Al-Abood ex rel. Al-Abood v. El-Shamari*,
   217 F.3d 225 (4th Cir. 2000) ...............................................................54

*Arndt v. First Union Nat'l Bank*,
   170 N.C. App. 518, 613 S.E.2d 274 (2005).........................................28

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ...................................................................58

*Boyce v. McMahan*,
   285 N.C. 730, 208 S.E.2d 692 (1974) ................................................28

*Brooks v. Price*,
   121 F. App'x 961 (3d Cir. 2005) .........................................................44

*Chaisson v. Simpson*,
   195 N.C. App. 463, 673 S.E.2d 149 (2009).........................................28

*Charlotte Motor Speedway, LLC v. Cnty. of Cabarrus*,
   748 S.E.2d 171 (N.C. App. 2013).........................................................27

*Conner v. Schrader-Bridgeport Int'l, Inc.*,
   227 F.3d 179 (4th Cir. 2000) ......................................................... 27, 38

*Connor v. Harless*,
   176 N.C. App. 402, 626 S.E.2d 755 (2006).........................................35

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ...............................................................55

*DaimlerChrysler Corp. v. Kirkhart*,
   148 N.C. App. 572, 561 S.E.2d 276 (2002).........................................51

*Dalton v. Camp*,
   353 N.C. 647, 548 S.E.2d 704 (2001) ................................................51

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)................................................... 3, 25, 55, 58

*Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*,
   192 N.C. App. 114, 665 S.E.2d 493 (2008).........................................28

*Fontenot  v. Taser Int'l, Inc.*,
   736 F.3d 318 (4th Cir. 2013) ...............................................................58

*Gell v. Town of Aulander*,
  252 F.R.D. 297 (E.D.N.C. 2008) .........................................................43

*Georgia v. Brailsford*,
  3 U.S. (3 Dall.) 1 (1794) .................................................................1

*Gray v. Genlyte Grp., Inc.*,
  289 F.3d 128 (1st Cir. 2002)...........................................................5

*Howell v. C.M. Allen & Co.*,
  8 N.C. App. 287, 74 S.E.2d 55 (1970)............................................35

*Kotteakos v. United States*,
  328 U.S. 750 (1946)........................................................................48

*MCB Ltd. v. McGowan*,
  86 N.C. App. 607, 359 S.E.2d 50 (1987).........................................35

*Midland Fire Prot., Inc. v. Clancy & Theys Const. Co.*,
  175 N.C. App. 420, 623 S.E.2d 369 (2006).....................................35

*Miller v. Rose*,
  138 N.C. App. 582, 532 S.E.2d 228 (2000).....................................28

*MLC Auto., LLC v. Town of S. Pines*,
  207 N.C. App. 555, 702 S.E.2d 68 (2010).......................................51

*MyGallons LLC v. U.S. Bancorp*,
  521 F. App'x 297 (4th Cir. 2013) ....................................................58

*Normile v. Miller*,
  313 N.C. 98, 326 S.E.2d 11 (1985) .................................................34

*Northington v. Michelotti*,
  121 N.C. App. 180, 464 S.E.2d 711 (1995)............................... 27, 35

*Quantum Corp. Funding, Ltd. v. B.H. Bryan Bldg. Co.*,
  175 N.C. App. 483, 623 S.E.2d 793 (2006).....................................34

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)................................................................. 27, 38

*Rosenfeld v. Basquiat*,
  78 F.3d 84 (2d Cir. 1996) ...............................................................50

*Rowland v. Am. Gen. Fin., Inc.*,
  340 F.3d 187 (4th Cir. 2003) .................................................... 50, 54

*Sales v. Grant*,
  158 F.3d 768 (4th Cir. 1998) ..........................................................26

*Swinton v. Potomac Corp.*,
  270 F.3d 794 (9th Cir. 2001) ...............................................................5

*Taylor v. Va. Union Univ.*,
  193 F.3d 219 (4th Cir. 1999) ..............................................................48

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
  29 F.3d 137 (4th Cir. 1994) ................................................................58

*United Labs., Inc. v. Kuykendall*,
  322 N.C. 643, 370 S.E.2d 375 (1988) ...............................................39

*United States ex rel. Drakeford v. Tuomey*,
  792 F.3d 364 (4th Cir. 2015) ..............................................................48

*United States v. Aspinall*,
  389 F.3d 332 (2d Cir. 2004) ...............................................................44

*United States v. Baker*,
  432 F.3d 1189 (11th Cir. 2005) ............................................................5

*United States v. Doswell*,
  670 F.3d 526 (4th Cir. 2012) ..............................................................42

*United States v. Gonzales-Flores*,
  701 F.3d 112 (4th Cir. 2012) ..............................................................42

*United States v. Morlang*,
  531 F.2d 183 (4th Cir. 1975) ..............................................................43

*United States v. Rivera*,
  412 F.3d 562 (4th Cir. 2005) ..............................................................42

*Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*,
  510 F.3d 474 (4th Cir. 2007) ..............................................................50

*Western Insulation, LP v. Moore*,
  242 F. App'x 112 (4th Cir. 2007) .......................................................58

*Williamson v. Miller*,
  231 N.C. 722, 58 S.E.2d 743 (1950) ..................................................30

## **Statutes and Rules**

Fed. R. Civ. P. 50 .............................................................................. passim

Fed. R. Civ. P. 61 .....................................................................................47

Fed. R. Evid. 702 .............................................................................. passim

Fed. R. Evid. 801 ................................................................................44

Fed. R. Evid. 802 ................................................................................44

N.C. Gen. Stat. § 66-187.1 ......................................................... 19, 40

N.C. Gen. Stat. § 75-1.1 .............................................................. 19, 23

28 U.S.C. § 2111 ................................................................................47

North Carolina Pattern Jury Instruction § 807.10..............................52

## **Other Authorities**

4 Christopher B. Mueller & Laird C. Kirkpatrick,
    *Federal Evidence* § 8:7 (4th ed. 2015) ........................................ 44, 45

## INTRODUCTION

As Chief Justice Jay wrote in the first jury trial before the United States Supreme Court, "on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide." *Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1, 4 (1794). The district court in this case violated this foundational principle.

At issue in this appeal are four legal errors committed by the district court during a two-week jury trial. Primary among these errors was the district court's decision to invade the province of the jury and decide a highly contested factual question in favor of the plaintiff, Clark Material Handling Co. One of the central disputed questions of fact during this trial was whether Clark had formed a binding contract with a third party, Southeast Industrial Equipment, Inc. ("SIE"), which would have required SIE to purchase forklifts from Clark and sell them throughout the Southeast. The district court, however, failed to permit the jury to decide this pivotal factual issue. Although there was ample evidence introduced at trial for a reasonable jury to find that no binding contract was formed, and despite the district court's *obligation* to view all of the evidence in favor of the defendant, Toyota Material Handing, U.S.A., Inc., the district court decided *sua sponte* that one of several incomplete draft contracts exchanged between Clark and SIE was a binding

contract.  This erroneous ruling decided an essential question of fact in favor of Clark.  This legal error requires a new trial.

The district court then matched this legal error with three other equally erroneous decisions.  First, the court permitted Clark to introduce a third-party witness's draft declaration and treat the witness's deletions from the draft as *substantive* proof that he disagreed with the deleted portions.  Because this draft declaration—which Clark made the centerpiece of its case before the jury—was hearsay, the district court abused its discretion in admitting it into evidence.

Second, the district court erroneously instructed the jury on the law governing Clark's claim for tortious interference with prospective economic advantage.  Under North Carolina law, this claim is premised on interference that causes a party to refrain from entering into a *future* contract.  The district court, however, instructed the jury that it could find for Clark if Toyota's interference precluded Clark from exercising an *existing* contractual right.  This error improperly permitted the jury to award Clark damages for years into the future based solely on a finding that Toyota interfered with an existing one-year contract.

Finally, the district court erred by allowing Clark's damages expert witness to project millions of dollars in damages over an 11.5-year period when the alleged contract had a one-year term, did not automatic renew, and was terminable on 30-days' notice.  Not only were the expert's projections without any evidentiary

support, they were also impermissibly based on another witness's marketing document that was admittedly misleading and lacked supporting data. The district court's abdication of its gatekeeping function under Federal Rule of Evidence 702 thus violated the mandate of *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

As explained below, each of these errors independently requires a new trial.

## JURISDICTIONAL STATEMENT

Appellant Toyota Material Handing, U.S.A., Inc., appeals a final judgment entered by the U.S. District Court for the Western District of North Carolina. After the district court denied Toyota's post-trial motion for judgment as a matter of law, new trial, and/or remittitur, Toyota filed a protective notice of appeal on July 2, 2015. (Dkt._265.) The district court entered final judgment in favor of Appellee Clark Material Handling Co. on July 9, 2015 (Dkt._268), and then an amended final judgment on July 31, 2015 (Dkt._274). Toyota filed an amended notice of appeal on August 4, 2015. (Dkt._275.) This Court has jurisdiction under 28 U.S.C. § 1291.

The district court had jurisdiction under 28 U.S.C. § 1332. Toyota is a California corporation with its principal place of business in California; Clark is a Delaware corporation with its principal place of business in Kentucky; and the

amount in controversy exceeded $75,000 exclusive of interest and costs.  (Dkt._24 ¶¶1-3; Dkt._25 ¶¶1-3.)

## STATEMENT OF THE ISSUES

1.    Did the district court erroneously grant judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure when a reasonable jury could have determined that no binding contract was formed in light of evidence that neither Clark nor SIE believed a contract existed and that there was no meeting of the minds as to the essential terms of quantity, price, and territory?

2.    Did the district court abuse its discretion by permitting Clark to introduce a third-party witness's draft declaration and rely on the witness's deletions from the draft as substantive proof that he disagreed with the deleted portions, when the draft constituted hearsay as a matter of law?

3.    Did the district court erroneously instruct the jury on Clark's claim for tortious interference with prospective economic advantage when it misstated North Carolina law by instructing that the claim is based on interference with an existing contractual benefit rather than interference that causes a party to refrain from entering into a future contract?

4.    Did the district court abuse its discretion by permitting Clark's damages expert, in violation of Rule 702 and *Daubert*, to speculate that Clark suffered millions of dollars in damages over an 11.5-year period for a one-year

contract that did not renew automatically and that was terminable upon 30 days'
notice?

## STATEMENT OF THE CASE

This appeal follows a two-week jury trial. The evidence at trial established
as follows.[1]

### 1.    The Parties.

Toyota is the nation's leading manufacturer of forklift trucks and parts.

Toyota manufactures most of its products at its Columbus, Indiana, headquarters,

with some components manufactured in Japan and other locations. (Tr._1400-02.)

Like most forklift manufacturers, Toyota does not generally sell its products

directly to customers. Instead, it distributes products to dealers, who sell and

---

[1] In an appeal of the denial of a post-trial Rule 59 motion challenging the
sufficiency of the evidence, this Court views the evidence in the light most
favorable to the prevailing party. But Clark does not get the benefit of that
standard in this appeal. With respect to Toyota's appeal of the district court's grant
of Clark's Rule 50(a) motion, this Court must view all evidence in the light most
favorable to *Toyota*, not Clark. *See infra* pp. 26-27. Toyota's hearsay, jury
instruction, and damages-expert arguments also challenge the district court's legal
rulings and do not present sufficiency of the evidence issues. With respect to those
arguments, the evidence is not viewed in the light most favorable to Clark, but
"evidence offered by either side or both may be pertinent." *Gray v. Genlyte Grp.,
Inc.*, 289 F.3d 128, 131 (1st Cir. 2002). Moreover, this Court "review[s] the record
*de novo* when conducting a harmless error analysis." *United States v. Baker*, 432
F.3d 1189, 1224 (11th Cir. 2005). "In reviewing a civil jury instruction for
harmless error, the prevailing party is not entitled to have disputed factual
questions resolved in his favor because the jury's verdict may have resulted from a
misapprehension of law rather than from factual determinations in favor of the
prevailing party." *Swinton v. Potomac Corp.*, 270 F.3d 794, 805-06 (9th Cir.
2001).

service the products in designated geographic regions.  (Tr._991-92, 1401-02.)

Toyota currently contracts with 67 dealers nationwide to sell and service its

products.  (Tr._1402.)

One of Toyota's nationwide forklift competitors is Clark.  Based in

Lexington, Kentucky, Clark likewise manufactures its own forklift trucks and

parts, and similarly distributes them through dealers.  Clark's manufacturing

facilities are located at its headquarters in Lexington, as well as in Mexico and

South Korea.  (Tr._1401.)  Although Clark was previously the largest U.S. forklift

manufacturer, Clark underwent bankruptcy in the early 2000s (Tr._71), and its

market share is now only 2.5-3% of the entire North American forklift market.

(Tr._1402.)  Clark currently has 79 dealers nationwide.  (Tr._1402.)

**2.    Clark Looks for a New Dealer in North Carolina, South Carolina, and Georgia.**

In January 2012, Clark learned that its dealer G&W Equipment, Inc., which

was responsible for selling Clark products in North Carolina and South Carolina,

was planning to terminate its relationship with Clark.  (Tr._143-44.)  G&W had

decided that it would be more profitable to sell products manufactured only by

Mitsubishi Caterpillar Forklift America, Inc. rather than sell products from two

competing companies.  (Tr._1323, 1328.)  In February 2012, G&W notified Clark

that it was terminating its dealer relationship.  (Tr._1323-24.)

The loss of G&W as a dealer caused Clark to scramble to find a replacement dealer.  Although numerous forklift dealers covered the G&W geographic region, Clark's replacement search focused on SIE, a well-known regional forklift dealer in North Carolina, South Carolina, and Virginia.  (Tr._148.)  SIE had never sold Clark products and, since 1991, had focused almost exclusively on selling Toyota products.  (Tr._331.)  Indeed, SIE was one of Toyota's largest dealers.  (Tr._795-96, 995, 1310.)  Nonetheless, despite SIE's long-standing focus on and relationship with Toyota—of which Clark was well aware (Tr._144, 147)—Clark considered SIE a good option to replace G&W.  (Tr._148.)

Cory Thorne, SIE's president (Tr._329), was open to, and initially enthusiastic about, the possibility of expanding SIE's business to include selling Clark products.  (Tr._358.)  Thorne wanted to grow SIE and thought that adding a Clark line could provide an opportunity to expand SIE's footprint and increase its profits.  (Tr._358.)  Without input from any other SIE executive or employee, or reliance on any data, Thorne prepared an aspirational business plan that explained what he hoped SIE could accomplish by selling Clark products.  (Tr._362-63, 470; Ex._19.)  As he later admitted, this aspirational plan was a marketing tool that contained misleading projections.  (Tr._153, 470.)  But Thorne also recognized there was an obvious conflict of interest should SIE sell Clark products, considering that Clark was a nationwide competitor of Toyota.  (Ex._19_at_8.)  In

an attempt to avoid this conflict, Thorne's aspirational plan proposed creating a separate SIE sales force that would sell only Clark products. (Tr._364-65.) However, Thorne's plan omitted many of the necessary details regarding *how* SIE could add a product line that would directly compete with its longstanding representation of Toyota, including the substantial start-up costs of purchasing new facilities and hiring and training new employees. (Ex._19.)

3.    **SIE and Clark Explore the Potential of Entering into a Dealer Agreement.**

In March 2012, Scott Johnson, Clark's vice president of business development (Tr._123), flew to Charlotte to meet with Thorne. (Tr._146.) Johnson toured SIE's facilities and discussed with Thorne the potential for SIE to represent Clark. (Tr._146-48.) Johnson and Thorne agreed to continue exploring the possibility of SIE representing Clark, and in April 2012, Thorne flew to Clark's Kentucky headquarters to meet with Clark's executives. (Tr._146-48, 153.)

While in Kentucky, Thorne presented his aspirational business plan to Clark's executives. (Tr._ 361-63; Ex._35.) Thorne explained that, while open to the idea of representing Clark, he was concerned that SIE could not fairly represent both Clark and Toyota—nationwide competitors in the same industry who sold similar products. (Tr._477-79.) Thorne also expressed concern that SIE would be the third dealership in the last ten years to represent Clark in North Carolina and South Carolina and that this would cause uneasiness among potential and existing

customers.  (Tr._474-75.)  And, unsurprisingly, Thorne was also concerned about the cost that SIE would incur by expanding its geographic footprint and hiring and training new employees.  (Tr._475-77.)

Despite Thorne's concerns, Clark's executives pushed for SIE to represent Clark.  Thorne agreed to continue the discussion, but insisted that before he entered into a dealer agreement, he visit the factories in South Korea where Clark manufactured its forklifts.  (Tr._504-05.)  Clark thus began to plan for such a visit.  (*Id.*)

### 4.    The May 17, 2012 Draft Dealer Sales Agreement.

After Thorne returned from Clark's headquarters, he and Clark began to negotiate the specifics of SIE's potential representation of Clark.  On May 17, 2012, Clark sent Thorne an unsigned initial draft of a "Dealer Sales Agreement" for him to review (the "May 17 Draft").  (Ex._365_at_6-20.)  This Draft specified that SIE was appointed a Clark dealer in specific counties in North Carolina, South Carolina, and Georgia.  (*Id.*_at_6-7.)  Dated effective May 17, 2012, the Draft specified that it would terminate on May 31, 2013, but also allowed SIE to terminate at any time, with or without cause, on thirty days' notice.  (Ex._365_at_15.)  The Draft also included a merger clause and provided that modifications to the agreement were effective only if made in writing and signed by both parties.  (Ex._365_at_20; Tr._102.)

Importantly, the May 17 Draft was incomplete. Despite being titled a "Dealer *Sales* Agreement," the most important portion of this Draft—the amount of Clark products SIE would purchase—was blank. (Ex._365_at_7.) Specifically, Paragraph 4 of the May 17 Draft read as follows:

> and frequently. DEALER agrees to place an initial stock order of__ rider products and __ Powrworker Product and $___ in CLARK parts. DEALER also agrees that it will at a minimum place the following orders in 2012: ___ Riders; and __ Powrworkers; and $_____ in CLARK parts.

(Ex._365_at_7.) Therefore, although the Draft specified that "[t]he relationship between CLARK and DEALER is that of buyer and seller" (Ex._365_at_11), these blanks meant that the May 17 Draft failed to require SIE to purchase *anything* from Clark (Tr._262, 267).

Even though the May 17 Draft was incomplete, Clark encouraged Thorne to sign and return it. (Tr._171, 283, 287.) But Thorne initially refrained from sending a signed copy to Clark. (Tr._504.) And even after Thorne eventually signed the May 17 Draft on June 4, 2012, he still did not immediately return it to Clark. (Tr._503-04.)

Unsurprisingly, given the significant blanks in the May 17 Draft, Thorne and Clark continued to negotiate various terms of SIE's possible representation of Clark. These negotiations focused primarily on the amount of Clark products SIE would agree to purchase and the geographic region in which SIE would be allowed to sell them. (Tr._276, 279-80, 288-92.)

On June 25, 2012, Johnson emailed Thorne and again asked him to send Clark a signed copy of the May 17 Draft. (Ex._40.) In the same email, Johnson asked if SIE wanted to add twelve additional counties in Georgia to the geographic areas specified in the May 17 Draft. (*Id.*) Less than an hour later, Thorne responded and stated that SIE did want to add the additional counties. (*Id.*) In a separate email later that same day, Thorne sent Johnson a scanned-in copy of his signed May 17 Draft. (Ex._365.) This signed copy still did not include the amount of products SIE agreed to purchase from Clark, nor did it include the additional geographic regions the parties agreed SIE would cover. (*Compare* Ex._159_at_ 3 *with* Ex._365_at_7.) As Johnson later conceded, under this signed May 17 Draft—which was supposedly a *sales* agreement—SIE had not yet agreed to purchase a *single* forklift or product from Clark. (Tr._262, 267.) As far as Clark was concerned, this meant that there was no binding agreement between it and SIE. Indeed, on both June 25 and July 6, Johnson told a representative from U.S. Bank—which would have provided SIE with the financing necessary to expand its business to add Clark products (Tr._420)—that SIE was not yet a Clark dealer because the parties had not yet agreed on the contract's terms. (Tr._175-76.)

After Thorne emailed Johnson the signed copy of the May 17 Draft, the parties continued to negotiate over its terms, including which specific Georgia counties Clark would add to those already specified in the May 17 Draft.

-11-

(Ex._159.) However, although the parties had not yet agreed to the amounts and types of products SIE would agree to purchase (Tr._85-86), on June 28, 2012, Johnson edited the signed May 17 Draft by hand (the "Modified May 17 Draft"). Specifically, Johnson edited Paragraph 4 to state that (a) SIE would initially purchase "products" rather than "rider products," with "35" being the number of purchases, and (b) in 2012 SIE would purchase a minimum number of "UNITS" instead of "Riders" and "Powerworks," with "75" as the minimum. Finally, Johnson wrote that the monetary value of the initial and minimum amount of Clark parts SIE would purchase was "TBD." The Modified May 17 Draft read:

> and frequently. DEALER agrees to place an initial stock order of 35 rider products and __Powerworker Product and $TBD in CLARK parts. DEALER also agrees that it will at a minimum place the following orders in 2012: 75 Riders; and Powrworkers; UNITS and $TBD in CLARK parts.

(Ex._174_at_2.) Johnson then initialed and dated the draft by his edits. (*Id.*)

Altogether, Johnson's unilateral edits to the May 17 Draft would (if enforceable) obligate SIE to purchase approximately $1.6 million worth of Clark products. (Tr._101.) Notably, Johnson's edits to the May 17 Draft did not include the additional Georgia counties that he and Thorne had discussed. (Tr._227-28, 276.)

Johnson then emailed a copy of the Modified May 17 Draft to Clark's CEO, Dennis Lawrence. (Ex._161.) Lawrence's reply to Johnson's email expressed

concern about the apparent lack of agreement over the amount of products SIE

would purchase from Clark:

> On the enclosed contract you have changed the wording on the
> required purchases in 2012 from riders to products and do not have
> any information in the parts section.  I thought we decided that we
> would always have a negotiated figure in this initial contract?  Please
> advise.

(Ex._161.)  Johnson responded that SIE was planning to send its top four parts

salesmen to Lexington to walk through Clark's parts programs, after which SIE

and Clark would together come up with the amount of parts SIE would purchase.

(*Id.*)  Johnson noted that:

> Cory and I are on the same page and there remains a clear
> understanding that a number will be necessary for 2012, we just want
> it to be the "best" number we can get to by analysis, not a guess.

(Ex._161.)  Lawrence then signed the Modified May 17 Draft on July 10, 2012.

(Ex._174.)  This is the document that Clark claimed at trial was the contract at

issue in each of its claims against Toyota.  (Tr._186-192, 200-201.)  A signed copy

of the Modified May 17 Draft was never sent to Thorne or anyone else at SIE.

(Tr._285-86.)

## 5.    The July 10, 2012 Draft Dealer Sales Agreement.

On July 10, 2012—the same day that Lawrence signed the Modified May 17

Draft—Johnson sent Thorne a new, also unsigned, draft sales agreement (the "July

10 Draft").  (Tr._199-200, Ex._21.)  This new draft included multiple changes

from the Modified May 17 Draft, reflecting the parties' continuing negotiations.

Specifically, the July 10 Draft included the additional Georgia counties the parties had discussed since the May 17 Draft was drafted.  (Ex._21_at_2.)  It also included updated numbers and descriptions in Paragraph 4:

and frequently.  DEALER agrees to place an initial stock order of _26_ Rider Products and _9_ Powrworkers Products and $_TBD_ in CLARK parts.    DEALER also agrees that it will at a minimum place the following orders in 2012:__75 units; and $_TBD_ in CLARK parts.

(*Id.*)

This updated Paragraph 4 then included the amount of products (though not parts) that SIE would agree to purchase from Clark.  (*Id.*)  Importantly, however, Paragraph 4's description of the products that SIE agreed to purchase was different from Johnson's handwritten edits to the Modified May 17 Draft.  While the Modified May 17 Draft specified that SIE would initially purchase "35 ~~rider~~ products and _ Powrworker [*sic*] Product" (Ex._174_at_2), the July 10 Draft specified that SIE would initially purchase "26 Rider Products and 9 Powrworkers [*sic*] Products" (Ex._ 21_at_2).  The July 10 Draft also changed the effective date of SIE's representation of Clark from May 17 to July 10, 2012, and changed the termination date from May 31 to July 31, 2013.  (Ex._21_at_1-2.)  Johnson also stopped asking Thorne for the original signed May 17 Draft because, in light of sending the July 10 Draft to Thorne, "it became a moot point."  (Tr._284.)

-14-

Thorne signed the July 10 Draft on July 10, 2012, the same day he received

it.  (Tr._401.)  However, Thorne never returned a signed copy of the July 10 Draft

to Clark, and no one from Clark ever signed the July 10 Draft.  (Tr._292.)

### 6.    SIE Decides Not to Represent Clark.

Although Thorne was in the process of negotiating a dealer agreement with

Clark, many SIE executives considered this plan misguided.  Steve Thorne, Cory

Thorne's father and the majority owner and CEO of SIE (Tr._1245-46), was

opposed to the idea from the start and shared his opposition with his son.

(Tr._1248.)  Other SIE executives and part owners also told Thorne during private

conversations that they opposed adding Clark.  (*See, e.g.*, Tr._1089-92, 1160,

1163-65, 1180, 1182-83.)

From July 11 through 13, 2012, SIE's Executive Committee met in

Greensboro, North Carolina, at the Grandover Resort for a long-planned business

retreat.  (Tr._408.)  The executives spent four to five hours discussing whether SIE

should agree to represent Clark.  (Tr._408-09.)  Although Thorne had previously

discussed representing Clark with some of the SIE executives, this was the first

time Thorne and the executives had a detailed discussion of the topic.  (Tr._1094.)

At this meeting, most of SIE's executives stated that they did not think adding

Clark was a good business plan.  (Tr._1113-17, 1121-23.)  They were worried

about the additional costs, as well as the inability to fairly represent two competing

brands.  (Tr._1113-17.)  Based on these concerns, Thorne and the SIE Executive

Committee decided not to proceed with representing Clark.  (Tr._ 1121-23.)

### 7.     Thorne Fails to Inform Clark that SIE Will Not Represent It.

Even though SIE decided not to represent Clark at its July 11-13 meeting,

Thorne refrained from informing Clark of this decision.  Thorne was highly

reluctant to tell Clark of SIE's decision because he did not want to ruin his

relationship with Johnson and wanted to "save [his] name."  (Tr._485.)  Thorne

even continued to act as if SIE still planned to represent Clark.  (Tr._507.)

Thorne's failure to communicate with Clark proved unwise.  On July 19,

2012, without any advance notice to SIE, Clark published a press release in the

Forklift Action Newsletter, a widely circulated trade publication, touting SIE as a

new Clark dealer.  (Tr._427, 486, 494.)

After this press release, Thorne became even more concerned about his

failure to inform Clark that SIE had decided not to represent Clark.  (Tr._433-34.)

Thorne ultimately decided that his best chance to save face and salvage his

relationship with Clark was "to pass the buck off on Toyota so [he] could say it

was their fault that [he] could not pick up the Clark line."  (Tr._485-86, 526.)

Thorne therefore told Clark that Toyota was pressuring him not to enter into a

dealer agreement with Clark—a statement that Thorne later testified was untrue.

(Tr._430, 485-86.)  Thorne even tried to save face by asking if Clark was willing to

enter an agreement with a different company than SIE—a plan Thorne had no

intention of implementing and hoped Clark would oppose (Tr._508-11)—but Clark

was open to the idea.  (Tr._509; Ex._15.)

Feeling immense pressure regarding how to resolve the situation (Tr._433),

Thorne ultimately wrote a letter to Clark that was intended to "let them know we

did not want to continue going forward as a Clark representative."  (Tr._435.)

Thorne also was not sure if SIE had formed a binding contract with Clark, and

wanted to "mak[e] sure that if I did have a binding agreement, that I abide by the

contract the way that it—or the agreement the way it was stated."  (Tr. 435.)

Thorne therefore referenced the termination section of the May 17 and July 10

Drafts in his letter.  (Ex._50.)

## 8.    SIE's Communications with Toyota.

As Thorne previously told Clark's executives, he was concerned that

representing Clark would interfere with SIE's current representation of Toyota.  As

a result, in mid-April 2012, after he met with Clark's executives, Thorne called

Brett Woods, the President of Toyota's parent company (Toyota Material Handling

North America) (Tr._371), to inform Woods of SIE's discussions with Clark.

(Tr._992-93.)  In late April, at Woods' recommendation, Thorne called Toyota

President Jeff Rufener to discuss the possibility that SIE might become a Clark

dealer.  Rufener told Thorne that he did not think that adding Clark would grow

SIE's business.  (Tr._995-96.)  Rufener opined that SIE would have a better chance of expanding its business if SIE instead focused on increasing its below-market-average sales in Virginia.  (Tr._995-96, 1051.)

On May 16, 2012—a month *after* learning about SIE's plans with Clark—Toyota executed a new dealership agreement with SIE, effective from April 18, 2012 through April 17, 2015.  (Ex._11.)  The next week, at Thorne's request, Rufener and Toyota's Vice President of Sales, Bob Bosworth, flew to Charlotte to visit SIE.  (Tr._997, 1358.)  Rufener and Bosworth again told Thorne that SIE would have a better chance of expanding its business if it focused on improving its existing Toyota sales rather than taking on a new product line.

Almost a month later, on June 20, 2012, Thorne and Rufener spoke again by phone.  Thorne told Rufener that he planned to represent Clark, but only in the areas where SIE did not represent Toyota.  (Ex._135.)  Thorne explained that, with respect to the areas where SIE represented Toyota, his "intentions were to provide aftermarket support, parts and service for [Clark], but not actively sell the Clark brand in the Toyota territory."  (Tr._1000.)  Thorne then asked how this would affect SIE's relationship with Toyota.  (Ex._135.)  Rufener again urged Thorne to focus on growing SIE's existing Toyota sales instead of representing Clark.  (*Id.*)

During SIE's Greensboro Executive Committee meeting, after SIE had decided not to represent Clark, Thorne called Rufener and informed him of the

-18-

decision.  (Tr._492-93.)  On July 19, 2012, Rufener read Clark's press release in

the Forklift Action Newsletter and believed it to be a mistake, so he called Thorne

to ask why this release was published if SIE had decided not to represent Clark.

(Tr._493-94.)  According to Clark, during this conversation, Rufener threatened

Thorne and coerced him to terminate SIE's relationship with Clark.  (Tr._1412-

14.)

**9.    The Litigation.**

On August 14, 2012, Clark sued Toyota in the Western District of North

Carolina, alleging claims for, *inter alia*, tortious interference with contract, tortious

interference with prospective economic advantage, coercion in violation of N.C.

Gen. Stat. § 66-187.1, and violation of North Carolina's Unfair and Deceptive

Trade Practices Act, N.C. Gen. Stat. § 75-1.1.[2]  All of these claims were based on

Clark's allegation that on or about July 19, 2012, Rufener contacted Thorne and

"pressured, coerced and intimidated Southeast into ending its relationship with

Clark."  (Dkt._24_¶22.)

Before trial began, Toyota moved to exclude as inadmissible hearsay a draft

declaration of Thorne's that was originally written by Toyota's outside counsel

(Ex._63), but that Thorne had heavily edited.  (Dkt._185, 186, 191; Pre._Tr._47-

54.)  Clark sought to introduce the redlined version of this draft declaration, which

---

[2] Clark's Amended Complaint alleged additional claims, but these were the four
claims presented to the jury.

showed each of Thorne's additions and deletions to the language drafted by Toyota's outside counsel.  Specifically, Clark intended to rely on Thorne's deletions of the following sentence in the draft as substantive evidence that the events in deleted sentences in fact did occur (Pre._Tr._51-52):

> forward with TMHU purchasing the SIE dealership. On July 10, 2012, I received an email from Bob Bosworth that accurately summarizes the June 29, 2012 telephone discussion. A true and correct copy of that email is attached here to as Exhibit 1. During our conversation, Jeff Rifener, Bob Bosworth and Alan Cseresznyak did not threaten me or SIE, intimidate me or SIE or attempt to coerce me or SIE in any way.

(Ex._63; Tr._395-97.)  The district court denied Toyota's motion to exclude this evidence, and permitted Clark to introduce Thorne's edits to the declaration as *substantive* proof that Thorne disagreed with the deleted language.  (Pre._Tr._53-54.)

Toyota also moved prior to trial to exclude Clark's damages expert, Seth Palatnik.  (Dkt._188.)  Toyota asserted that, pursuant to Rule 702 of the Federal Rules of Evidence, Palatnik's testimony was inadmissible speculation.  Toyota argued that Palatnik's projection was not based on reliable data, but was instead based on Thorne's own aspirational plan—a plan Thorne admitted was a misleading marketing plan.  (Tr. _470-72, 758, 797.)  Toyota also argued that Palatnik's 11.5-year, multi-million dollar projection was improper because the alleged dealer contract was a one-year contract, terminable at will upon 30 days'

notice. (Dkt._188.) The court overruled this motion at the start of trial. (Tr._58-59.)

During the middle of the first day of trial, the district court directed Clark to identify the specific contract on which its claims were premised. (Tr._180-82.) The court was confused regarding whether Clark was alleging that Toyota interfered with the original May 17 Draft, the Modified May 17 Draft, the July 10 Draft, or some oral understanding. (Tr._180-82.) The court wanted Clark to make this decision because it was unwilling to present multiple potential contracts to the jury and then let it decide which, if any, was the contract at issue. (Tr. _186.) Clark responded that its claims were based on the Modified May 17 Draft (Tr._186-88)—*i.e.*, the draft that contained Thorne's June 4 signature, Johnson's June 28 edits, and Lawrence's July 10 signature. The district court then instructed the jury that this draft was the contract at issue in this case, and that this was the contract the jury would determine was or was not binding. (Tr._192, 200-201.)

Despite its statement that the jury would determine whether the Modified May 17 Draft was a binding contract, the district court ultimately removed this pivotal factual issue from the jury. During an off-the-record discussion in the middle of trial during a snow day, the district court *sua sponte* mentioned that it intended to rule as a matter of law that a contract existed. This comment was made despite the fact that Clark had yet to actually move for judgment as a matter of law

-21-

on this issue.  Indeed, in response to Toyota's motion for judgment as a matter of law after the close of Clark's evidence, Clark's attorneys represented that the evidence of a contract was only "*almost* worthy of directed verdict." (Tr._833 (emphasis added).)   However, at the district court's direction, Clark moved at the close of all of the evidence for judgment as a matter of law that the Modified May 17 Draft was an enforceable contract.  (Tr._1392-93.)  Without any on-the-record explanation, the district court granted the motion.  (Tr._1393.)

At trial, over Toyota's objection, Palatnik opined that Clark incurred damages of 11.5 years of lost profits.  (Tr._754, 777.)  Even though the term of the Modified May 17 Draft was for a single year, Palatnik assumed that Clark and SIE would indefinitely renew the Draft.  (Tr._753-56, 791-92.)  However, Palatnik also testified that, for the actual one-year term of the Modified May 17 Draft, Clark's damages were limited to $683,000.  (Tr._801-04.)  The jury returned a verdict in favor of Clark and awarded Clark damages of $3,040,090.  (Dkt._228.)  The jury therefore compensated Clark for lost profits well beyond the one-year term of the Modified May 17 Draft.

On Clark's motion, the district court trebled the damages pursuant to N.C. Gen. Stat. § 75-1.1 and awarded Clark attorneys' fees, for a total judgment against Toyota of $11,325,903—more than *sixteen times* the damages Clark's own expert calculated for the one-year term of the Modified May 17 Draft.  (Dkt._274.)  The

-22-

court denied Toyota's post-trial motion for judgment as a matter of law, new trial, and/or remittitur.  (Dkt._258.)

## SUMMARY OF THE ARGUMENT

This Court should order a new trial for four independent reasons.

*First*, the district court erred in ruling as a matter of law that the Modified May 17 Draft was a binding contract, rather than allowing the jury to determine this disputed factual question.  Viewing all of the evidence in the light most favorable to Toyota, a reasonable jury could have concluded that no binding contract existed because the Modified May 17 Draft did not represent a meeting of the minds on all essential terms.  Indeed, neither Clark nor SIE believed that the Modified May 17 Draft was an enforceable, binding contract.  Moreover, there was evidence that there was no meeting of the minds on three terms of the Draft—the amount of products SIE agreed to purchase from Clark, the price of the products, and the counties in which SIE would represent Clark.  Because these were all essential terms, the district court erred when it declined to allow the jury to decide this pivotal factual issue.

Importantly, this erroneous ruling requires a new trial on all issues presented to the jury.  The district court's erroneous ruling, and subsequent jury instruction that the Modified May 17 Draft was a binding contract, was central to every issue presented to the jury and requires a new trial on all issues.

-23-

*Second*, the district court abused its discretion by admitting into evidence Thorne's edited draft declaration. The court permitted Clark to point to Thorne's deletions of statements that Toyota did not coerce, threaten or intimidate him as assertions that Toyota in fact did those things. Because these assertions were inadmissible hearsay as a matter of law, the admission of the draft declaration was an abuse of discretion.

This abuse of discretion also requires a new trial on all issues as it prejudiced Toyota's substantial rights. Clark relied heavily on the edits to Thorne's draft declaration as *substantive* evidence that Toyota coerced, threatened, and intimidated Thorne, pointing to Thorne's assertions in its opening statement, its examination of Thorne, and its closing argument. Evidence that the key individual in this case supposedly admitted that Toyota threatened, coerced, and intimidated SIE—a *necessary* finding for every issue presented to the jury—was therefore highly prejudicial to Toyota and affected its substantial rights.

*Third*, the district court's jury instruction on Clark's claim for tortious interference with prospective economic advantage was contrary to North Carolina law. Under North Carolina law, this claim requires a finding that the tortious conduct caused a third party to refrain from entering into a *future* contract with the plaintiff. But over Toyota's objection, the district court instructed the jury that this claim was based on wrongful interference with an *existing* contract that conferred a

-24-

future economic advantage to Clark. The district court never required the jury to find that Toyota's tortious interference caused SIE and Clark to refrain from entering into or renewing a contract.

*Fourth*, the district court abdicated its gatekeeper function by allowing Clark to present a damages expert who relied primarily on Thorne's misleading marketing plan. The error was compounded by allowing the expert to project damages over 11.5 years when the alleged contract had a one-year term, did not automatically renew, and had a 30-day termination clause (which SIE exercised). The district court's decision contravenes Rule 702, *Daubert*, and controlling authority from this Court.

Accordingly, this Court should reverse the judgment and remand this case for a new trial.

# ARGUMENT

## I.    THE DISTRICT COURT ERRONEOUSLY RULED THAT A CONTRACT EXISTED BETWEEN CLARK AND SIE AS A MATTER OF LAW.

At the close of all of the evidence, the district court entered judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure in favor of Clark on the issue of whether a contract existed between Clark and SIE. Specifically, the district court held that the Modified May 17 Draft was an enforceable contract and declined to allow the jury to decide this pivotal factual issue. (Tr._1392-93.) This core legal error requires a new trial on all claims.

Under Rule 50(a), in a jury trial, the district court may grant a motion for judgment as a matter of law "if a party has been fully heard … and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50 (a)(1). This Court reviews the grant of a Rule 50(a) motion *de novo* and reviews the evidence in the light most favorable to the nonmoving party, here Toyota. *Sales v. Grant*, 158 F.3d 768, 775 (4th Cir. 1998). This Court must therefore give Toyota "the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility." *Id.* The Court should affirm the district court's grant of judgment only if the sole conclusion a reasonable jury could draw from the evidence was in Clark's favor. *Id.*; *see also Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d

179, 192 (4th Cir. 2000) ("If, giving the non-movant the benefit of every legitimate inference in her favor, there was evidence upon which the jury could reasonably return a verdict for her, we must reverse the judgment below."). And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). As explained below, viewing the evidence in the light most favorable to Toyota, the district court erred when it ruled as a matter of law that the Modified May 17 Draft was an enforceable contract.

### A.    There Was Sufficient Evidence For a Reasonable Jury to Find that the May 17 Draft Was Not an Enforceable Contract.

Viewing the evidence in the light most favorable to Toyota, there was sufficient evidence presented at trial for a reasonable jury to find that the Modified May 17 Draft was not a binding and enforceable contract.

Under North Carolina law, "a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." *Charlotte Motor Speedway, LLC v. Cnty. of Cabarrus*, 748 S.E.2d 171, 176 (N.C. App. 2013). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to *all* essential terms of the agreement." *Northington v. Michelotti*, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) (emphasis added). "There must be neither doubt nor difference between the parties[; t]hey must assent to the same thing in the same sense, and their minds must meet as to all the terms."

-27-

*Chaisson v. Simpson*, 195 N.C. App. 463, 470-71, 673 S.E.2d 149, 156 (2009) (brackets in the original) (quotation marks omitted); *see also, e.g.*, *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974).

Indeed, "[t]o be enforceable, the terms of a contract must be sufficiently definite and certain, and a contract that leav[es] material portions open for future agreement is nugatory and void for indefiniteness." *Miller v. Rose*, 138 N.C. App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (internal citations and quotation marks omitted). "If *any* portion of the proposed terms is not settled, there is no agreement." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 192 N.C. App. 114, 126, 665 S.E.2d 493, 502 (2008) (emphasis added) (quotation marks omitted). Importantly, the existence of a binding contract, including whether there was a meeting of the minds on all essential terms, is a question of fact for the jury. *See Chaisson*, 195 N.C. App. at 470-71, 673 S.E.2d at 156; *Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 523, 613 S.E.2d 274, 278 (2005).

At trial, there was ample evidence that a reasonable jury could accept as showing that no binding contract existed between Clark and SIE. Primary among this was the evidence that neither SIE nor Clark believed that the Modified May 17 Draft constituted a binding contract. Thorne himself testified that he was unsure if SIE *ever* had a binding agreement with Clark. (Tr._435.) Johnson likewise testified that asking Thorne to send Clark signed copies of the Modified May 17

-28-

Draft was a "moot point" because the July 10 Draft represented the most recent iteration of the parties' negotiations—*i.e.*, the Modified May 17 Draft did not contain the latest terms discussed by the parties. (Tr._284.) Indeed, Clark never sent a signed copy of the Modified May 17 Draft to Thorne, even though, as Johnson testified, it was Clark's practice to send dealers copies of their binding agreements. (Tr._285-86.)

Johnson also twice told a U.S. Bank representative, on June 25 and July 6, that SIE was *not* a Clark dealer because there was no binding contract, explaining that "you do not mislead the bank." (Tr._175-76.) And there was also evidence that the Modified May 17 Draft was never signed by SIE, as Thorne signed only the original May 17 Draft and the July 10 Draft, both of which contained terms different from those in the Modified May 17 Draft. (*Compare* Ex._365_at_7 *with* Ex._21_at_2.) Giving Toyota the benefit of every reasonable inference, this evidence *alone* permits a reasonable jury to conclude that the Modified May 17 Draft did not represent a meeting of the minds between Clark and SIE and, thus, was not a binding contract.

However, beyond this evidence, there was clear evidence that the Modified May 17 Draft did not represent a meeting of the minds on three essential and material terms: (1) the amount of Clark products SIE agreed to purchase; (2) the price of those Clark products; and (3) the territory in which SIE would represent

-29-

Clark.  Because North Carolina law mandates a meeting of the minds on these

three terms before the Modified May 17 Draft could represent a binding contract,

this evidence establishes that the district court erred when it took this issue from

the jury.

> **1.    There Was Sufficient Evidence that the Modified May 17 Draft Did Not Represent a Meeting of the Minds on the Essential Term of the Quantity of Clark Products that SIE Would Purchase.**

When the district court held that the Modified May 17 Draft was an

enforceable contract, it ignored the evidence presented to the jury that there was no

meeting of the minds on the amount of Clark products SIE agreed to purchase.

Because this is an essential term, the district court's holding was erroneous.

Under North Carolina law, the quantity of products to be sold and bought is

an essential term in a distributorship agreement.  *See Williamson v. Miller*, 231

N.C. 722, 726-28, 58 S.E.2d 743, 746-47 (1950) (holding that a distributorship

agreement is unenforceable when it left blank the specified quantity of oil and

other products that the defendant would sell on behalf of the plaintiff).

Furthermore, Clark itself considered this term essential and material to the

agreement.  As Johnson testified, it was "very important" to Clark to reach

agreement on these amounts.  (Tr._251.)  And Lawrence confirmed this, testifying

that it was important to Clark to make sure that these amounts were agreed upon

"to make sure that we knew what we were agreeing to."  (Tr._106-07; *see also*

Ex._161 (Lawrence writing that Clark required these amounts to be agreed upon before entering into a contract with a dealer).)

Therefore, in order for the Modified May 17 Draft to be an enforceable contract, it must represent a meeting of the minds on the amount of Clark products SIE agreed to purchase. And because there was ample trial evidence—especially when viewed in the light most favorable to Toyota—that the Modified May 17 Draft did *not* represent a meeting of the minds on this essential term, the district court's Rule 50(a) judgment was in error.

*First*, when Thorne signed the May 17 Draft on June 4, 2012, key provisions regarding SIE's obligations to purchase Clark products were blank:

> and frequently. DEALER agrees to place an initial stock order of__ rider products and __ Powrworker Product and $___ in CLARK parts. DEALER also agrees that it will at a minimum place the following orders in 2012: ___ Riders; and __ Powrworkers; and $_____ in CLARK parts.

(Ex._365_at_7.) Therefore, Thorne's signature on the May 17 Draft, as well as on the Modified May 17 Draft, does not represent SIE's consent to purchase *any* Clark products, a point Clark *expressly* acknowledged. (*See* Tr._262 (Johnson conceding that, because of these blanks, SIE "had not agreed to buy a single forklift or a single part according to this contract").)

*Second*, when Johnson unilaterally filled in some—but not all—of the blanks on June 28, Clark and SIE still "had not fully negotiated" the type or amount of products that SIE was to purchase from Clark. (Tr._264.) This was why Johnson's

edits did not differentiate between "rider" and "powerworker" products, and inserted "TBD" (to be determined) for the amount of parts SIE would purchase (Ex._161):

and frequently. DEALER agrees to place an initial stock order of 35 rider products and Powrworker Product and $TBD in CLARK parts. DEALER also agrees that it will at a minimum place the following orders in 2012: 75 Riders; and Powrworkers; UNITS and $TBD in CLARK parts.

(Ex._174_at_2.)  Indeed, Johnson testified that even *after* his edits, he and Thorne were *still* negotiating these amounts.  (Tr._200, 288-291.)

*Third*, when Lawrence signed the Modified May 17 Draft, SIE and Clark *still* had not agreed to these amounts.  Johnson's July 10 email to Lawrence explained that he was still negotiating the amounts with SIE.  (Ex._161.) Lawrence testified that, even when he signed the draft, "my understanding was that they were still working on getting the final numbers put through."  (Tr._84; *see also* Tr._85-86 (Lawrence testifying that Johnson was "still talking to the dealership about the numbers" and "we're still going through all this and still trying to get to a consensus on what we're looking for").)

*Fourth*, Thorne never signed a copy of the Modified May 17 Draft or any other draft that had terms consistent with Johnson's edits to Paragraph 4 in the Modified May 17 Draft.  (Tr._291-92.)  While Johnson knew that Clark needed Thorne to initial the edits to indicate that he agreed with them, he never asked Thorne to sign the Modified May 17 Draft.  (Tr._288, 291-92.)

-32-

*Fifth*, on July 10—the same day Lawrence signed the Modified May 17 Draft—Johnson sent Thorne a new draft with *different* terms in Paragraph 4 than those contained in the Modified May 17 Draft. Unlike the Modified May 17 Draft, the July 10 Draft now specified that SIE would purchase a specific number of "Rider Products," as well as a specific number of "Powrworkers [*sic*] Products":

and frequently. DEALER agrees to place an initial stock order of __26__ Rider Products and __9__ Powrworkers Products and __$ TBD__ in CLARK parts. DEALER also agrees that it will at a minimum place the following orders in 2012: __75 units__; and __$ TBD__ in CLARK parts.

(Ex._21_at_2.) These new amounts were based on Thorne and Johnson's continuing discussions. (Tr._291, 401-02.) As Johnson testified, the purpose in sending this new draft was to "memorialize[] some sale numbers that we had talked about." (Tr._200, 291, 401-02.) Because the parties were still negotiating as of July 10, and the July 10 Draft contained terms different from those in the Modified May 17 Draft, the Modified May 17 Draft cannot reflect a meeting of the minds on the amount and type of products SIE agreed to purchase.

*Finally*, neither the Modified May 17 Draft nor the July 10 Draft reflects *any* agreement on the amount of Clark parts that SIE would purchase. Instead, both documents simply list these amounts as "TBD." (Ex._21, Ex._174.) When Lawrence asked why these numbers were "TBD," Johnson replied that Clark and SIE would decide them in the *future* but had yet to actually reach an agreement on these amounts. (Ex._161.)

-33-

Viewed in the light most favorable to Toyota, there was clearly sufficient evidence for a reasonable jury to find that there was no meeting of the minds on the essential term of the amount of products SIE would purchase from Clark. At no point did both Clark and SIE agree to the specific terms contained in Paragraph 4 of the Modified May 17 Draft. Instead, Thorne agreed to the blank terms of Paragraph 4 in the original May 17 Draft, whereas Clark agreed to the edited terms in the Modified May 17 Draft. Therefore, Clark's edits to and subsequent signature on the Modified May 17 Draft constituted a *counteroffer. Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985). And because there is evidence that SIE never accepted this counteroffer before Clark again changed the proposed amounts on July 10 and sent a new draft contract, the Modified May 17 Draft is not a binding contract. *See Quantum Corp. Funding, Ltd. v. B.H. Bryan Bldg. Co.*, 175 N.C. App. 483, 489-90, 623 S.E.2d 793, 798 (2006) ("In the absence of acceptance of the counteroffers, there is no contract."); *Normile*, 313 N.C. at 108, 326 S.E.2d at 18 (same).

Furthermore, as to the amount of Clark parts SIE would purchase, the evidence shows that, *at most*, the Modified May 17 Draft was an agreement to *later* agree on this amount. But it is unassailable that "[a] contract, and by implication a provision, 'leaving material portions open for future agreement is nugatory and void for indefiniteness.'" *MCB Ltd. v. McGowan*, 86 N.C. App. 607,

609, 359 S.E.2d 50, 51 (1987); *see also, e.g.*, *Connor v. Harless*, 176 N.C. App. 402, 406, 626 S.E.2d 755, 757-58 (2006) (same); *Northington*, 121 N.C. App. at 184, 464 S.E.2d at 714 ("a so-called 'contract to make a contract' is not a contract at all.").  Therefore, because there was evidence that the Modified May 17 Draft does not represent a meeting of the minds on the material terms contained in Paragraph 4, the district court erred in entering Rule 50(a) judgment in favor of Clark.

### 2.   There Was Sufficient Evidence that the Modified May 17 Draft Did Not Represent a Meeting of the Minds on the Price of the Clark Products SIE Would Purchase From Clark.

Consistent with the evidence that there was no meeting of the minds on the essential term of the products SIE would purchase from Clark, there was also evidence that the parties had not agreed to another essential term—the price of these products.

Under North Carolina law, price is an essential term of a contract.  *See Midland Fire Prot., Inc. v. Clancy & Theys Const. Co.*, 175 N.C. App. 420, 623 S.E.2d 369 (2006) ("The essential terms of a contract include … the price to be paid under it."); *Howell v. C.M. Allen & Co.*, 8 N.C. App. 287, 290, 74 S.E.2d 55, 56-57 (1970) ("price or compensation is an essential ingredient of every contract").  Therefore, a meeting of the minds on price is a prerequisite to the formation of a contract.  *See Connor*, 176 N.C. App. at 405-06, 626 S.E.2d at 757-58.

At trial, Johnson testified that, as of June 28, 2012, the parties had not agreed upon the price SIE would pay for the products it purchased from Clark. (Tr._264.)  Indeed, Johnson testified that the price of Clark products varies widely based on the specifics of each product that is purchased.  (Tr._264, 268-69.)  And based on this lack of agreement, Johnson testified that there was no real understanding between SIE and Clark under the Modified May 17 Draft as to the financial commitment SIE was making.  (Tr._269.)  As explained above, a binding contract cannot leave material terms open for future negotiation.  *See supra* pp. 34-35.

Therefore, there was ample evidence that there was no meeting of the minds on the essential term of the price SIE would pay for each product it purchased from Clark.  The district court thus erred in granting judgment as a matter of law that a binding contract was created.

>    **3.    There Was Sufficient Evidence that the Modified May 17 Draft Did Not Represent a Meeting of the Minds on the Geographic Areas in Which SIE Was Allowed to Sell Clark Products.**

In addition to the lack of an agreement on the amount and price of the products SIE would purchase from Clark, there was also evidence that the Modified May 17 Draft did not represent a meeting of the minds as to the territory in which SIE would represent Clark.  At trial, Johnson testified that "territory is a material term of [Clark's] contracts with [its] dealers."  (Tr._280.)  Therefore, this

evidence provides an additional reason the district court erred in granting judgment as a matter of law on this issue.

The Modified May 17 Draft specified that SIE's "area of primary responsibility" would cover various counties in North Carolina, South Carolina, and Georgia. (Ex._174_at_1-2.) However, before Thorne returned his signed copy of the May 17 Draft, Johnson offered SIE an additional dozen counties in Georgia to cover. (Ex._40.) Just a few hours before Thorne emailed his copy of the May 17 Draft back to Clark, Thorne wrote that SIE wanted to add these counties to the draft. (*Id.*) The parties then discussed adding these additional counties from June 28 through July 10, when Clark sent Thorne a new draft that contained these additional counties. (Tr._279.) As Johnson testified, one purpose of the July 10 Draft was to "include[] additional territory that Mr. Thorne and I had talked about." (Tr._200.) This means that when Lawrence signed the Modified May 17 Draft on July 10, it did not contain the complete meeting of the minds on the geographical areas SIE would cover.[3]

---

[3] Clark might argue that during conversations and emails Clark and SIE reached agreement regarding territory. However, during trial Clark told the court that the enforceable contract was the *written* Modified May 17 Draft, thus expressly disclaiming reliance on any agreement outside the terms of that document. (Tr._180-82, 186-88.) And the court instructed the jury that this written document, by itself, "is the contract at issue." (Tr._201.)

Therefore, because Clark and Thorne had agreed on additional counties that were not included in the Modified May 17 Draft on the date it was signed by Clark, it cannot represent a meeting of the minds on this essential term.

*      *      *

When viewing the evidence in the light most favorable to Toyota, a reasonable jury certainly could have found that the Modified May 17 Draft was *not* a binding contract. Although Clark may point to evidence that the Modified May 17 Draft did represent a meeting of the minds on all essential terms, doing so disregards the pertinent inquiry on appeal. Rather, all this Court need determine is whether—when viewing all of the evidence in the light most favorable to Toyota and "disregard[ing] all evidence favorable to [Clark] that the jury is not required to believe," *Reeves*, 530 U.S. at 151—there is *any* evidence that the Modified May 17 Draft did not represent a meeting of the minds on all essential terms. *See Conner*, 227 F.3d at 192. And because there unquestionably was such evidence, this Court must reverse the district court.

## B.    The Erroneous Rule 50(a) Order Requires a New Trial on All Issues.

Clark may argue that, even if the district court's Rule 50(a) order was in error, this does not necessitate a new trial on all claims. This argument would be wrong.

-38-

Immediately before describing the issues the jury was asked to determine, the district court instructed the jury, over Toyota's objection (Tr._1496), that it had "determined based on a legal review of the documents that a contract existed between SIE and Clark, which is the May 17, 2012, contract found in the record." (Tr._1510.)  The court then immediately instructed the jury on all four liability issues, plus the issue of damages.  (Tr._1510-22.)  The jury found for Clark on all liability issues[4] and awarded Clark a single damages amount based on the amalgam of these four issues.  (Dkt._228.)  Because the district court's erroneous instruction that an enforceable contract existed between Clark and SIE was central to all five issues presented to the jury, this error requires a new trial on all issues.

*First*, the jury found that "Toyota wrongfully interfere[d] with a contract right between Clark and Southeast Industrial Equipment ('SIE')."  (Dkt._228.) Obviously, the existence of a "contact right" requires a binding contract.  Indeed, an element of the claim for tortious interference with contract is the existence of a contract.  *See United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).  Pursuant to its Rule 50(a) order, the district court erroneously instructed the jury that, with respect to this issue, a contractual right did exist. (Tr._1511-12.)

---

[4] Issue 4 provided the jury two independent grounds under which to find Toyota liable for its alleged unlawful coercion.  The jury found in favor of Clark on Issue 4(a), but then found in favor of Toyota on Issue 4(b).  (*See* Dkt._228.)

-39-

*Second*, the jury found that "Toyota wrongfully interfere[d] with a prospective economic advantage attained by Clark in its *contract* with SIE." (Dkt._228 (emphasis added).)  This wording on the verdict form demonstrates that this "prospective economic advantage" comes from the "contract" between SIE and Clark.  And the district court instructed the jury on this issue that it must determine whether "the Clark/SIE *contract* conferred upon Clark some prospective contractual right or advantage it could have enforced against SIE[,]" and that it must then determine whether Toyota  "maliciously induced SIE not to perform the contract."  (Tr._1515 (emphasis added).)  The district court concluded its instruction by stating that a "yes" to this issue requires that the jury find "that Toyota wrongfully interfered with *a valid contract* between Clark and SIE that conferred a future economic advantage to Clark ...."  (Tr._1515-16 (emphasis added).)  The jury's "yes" finding was thus predicated on the district court's instruction that a valid contract existed.

*Third*, the jury found that "Toyota coerce[d] SIE into terminating its dealer relationship with Clark, and to therefore stop purchasing forklifts manufactured by Clark."  (Dkt._228.)  The district court explained that this claim was predicated on N.C. Gen. Stat. § 66-187.1, which "makes it unlawful for a supplier of goods to coerce a dealer into refusing to purchase equipment manufactured by another supplier."  (Tr._1516.)  The district court then described "supplier" as a

"manufacturer … who enters into *an agreement* with a dealer."  (Tr._1516.)  The district court then concluded its instructions on this issue by stating that a "yes" on this issue required the jury to find that "Toyota coerced SIE into terminating its dealer relationship with Clark …."  (Tr._1517.)  Because the district court had instructed the jury that SIE and Clark had a "dealer relationship" based on "an agreement," the district court's erroneous Rule 50(a) judgment infected this issue as well.

*Fourth*, the jury found that "Toyota unlawfully coerce[d] SIE into ending its relationship with Clark by threatening to terminate Southeast's Toyota dealership in Virginia."  (Dkt._228; Tr._1518.)  Again, the referenced "relationship" and "dealership" arose from the alleged contract between Clark and SIE.  Just as with Issue Three, because the district court had already instructed the jury that there was a valid contract between Clark and SIE, the erroneous judgment infected this issue.

And *finally*, the jury's damages award was based on the sole question of "what amount has the business of Clark been injured by Toyota's conduct?" (Dkt._228.)  Because the jury's damage award did not specify on which specific "conduct" it was based, the district court's erroneous judgment requires a new trial on damages.

-41-

This Court should therefore order a new trial on all issues based upon the district court's erroneous judgment as a matter of law that an enforceable contract existed between Clark and SIE.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THORNE'S DRAFT DECLARATION.

One of Clark's primary themes throughout trial was that Thorne's deletion of certain statements from his draft declaration represented an admission that he was coerced by Toyota.  Specifically, Clark pointed to Thorne's deletions of statements that Toyota did not try to threaten, coerce, or intimidate Thorne or SIE as proof that Toyota *did* those things.  The district court abused its discretion by admitting the draft declaration and permitting Clark to rely on these out-of-court statements for the truth of the matter asserted.

Admission of evidence is reviewed for an abuse of discretion.  *United States v. Doswell*, 670 F.3d 526, 529 (4th Cir. 2012).  However, "whether an out-of-court statement constitutes hearsay [is] a question of law."  *United States v. Gonzales-Flores*, 701 F.3d 112, 117-18 (4th Cir. 2012).  Legal decisions concerning the rules of evidence are reviewed *de novo*.  *United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005).

Before trial, Toyota moved to exclude Thorne's draft declaration (Ex_63), which contained redlined additions and deletions made by Thorne.  (Pre._Tr._47-54; Dkt._185, 186, 191.)  Toyota argued that Clark was not permitted to introduce

Thorne's deletions as assertions by Thorne that he disagreed with the deleted statements because this would constitute inadmissible hearsay. (Pre._Tr._53.) The district court, however, wanted the jury "to know how the sausage is made." (Pre._Tr._54.) It therefore permitted Clark to introduce the draft declaration and rely on Thorne's deletions as *substantive evidence* that, through his edits, Thorne asserted that he disagreed with the deleted statements. (*Id.*; Tr._392-400.) The district court reaffirmed this ruling when Toyota again objected at trial to Clark's use of the draft declaration. (Tr._392-99.)

This represented an abuse of discretion. The draft declaration was inadmissible hearsay as a matter of law that the district court should not have allowed Clark to introduce and rely upon as substantive evidence. And because this hearsay evidence was central to Clark's case, this abuse of discretion substantially prejudiced Toyota and necessitates a new trial on all issues.

### A.    Thorne's Edits to the Draft Declaration Are Inadmissible Hearsay.

This Court has previously recognized that "prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof." *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975). Hence, a draft of a non-party's affidavit is inadmissible hearsay. *See, e.g.*, *Gell v. Town of Aulander*, 252 F.R.D. 297, 300-01 (E.D.N.C. 2008).

-43-

This comports with the Federal Rules of Evidence.  Under Rule 802, unless a specific exception applies, "[h]earsay is not admissible."  Fed. R. Evid. 802. Rule 801 defines hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c). Because Thorne's edits to his draft declaration are inadmissible hearsay, the district court abused its discretion in admitting them into evidence.

*First*, Thorne's deletions are out-of-court "statements."  Rule 801(a) defines "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).  Thus, the term "statement" under Rule 801 "reaches not only verbal expressions, but nonverbal expressive and communicative behavior when it amounts to a substitute for words."  4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:7, at 59 (4th ed. 2015).  Courts construe this definition broadly, and find that witnesses make an "assertion"—and thus a Rule 801 "statement"—whenever they intend to convey something through their actions.  *See, e.g.*, *Brooks v. Price*, 121 F. App'x 961, 967-68 (3d Cir. 2005) (holding that the failure of the defendant's superior to chastise him after conducting a review of his conduct was an assertion that the superior believed no excessive force was used); *United States v. Aspinall*, 389 F.3d 332, 342 (2d Cir. 2004) (holding that giving items to a police agent in

response to the agent's inquiry was an assertive act that constituted hearsay); *see*

*generally* 4 *Federal Evidence*, *supra*, § 8:7.

At trial, it was uncontested that Clark used Thorne's deletions from the draft

declaration as assertions that he disagreed with the deleted portions. The district

court recognized this when deciding whether to admit the draft declaration:

> And this is a—this is a *statement* that occurs after the fact that says
> this is what happened in that time period.… [T]he whole idea is what
> occurred during this period of time and this is sort of an attempt to
> write history and they say, is this what occurred? He goes, no, I think
> it's more like this is what occurred…. But that appears to me to be an
> historical recording of what you all say and *Mr. Thorne said* happened
> during this transaction.

(Pre._Tr._48-49 (emphasis added).) Indeed, Clark's counsel argued for the

admission of the draft declaration *because of* what they claimed Thorne meant to

convey through his edits:

> So what the outside counsel is doing is he's saying, hey guys, what's
> our story here? What can I put into this affidavit? What are we going
> to say? And he provides that to Mr. Thorne who *says* what you guys
> said here isn't true.

(Pre._Tr._51-52 (emphasis added).) In response, Toyota's trial counsel pointed out

exactly what Clark was attempting to do:

> I think that what Clark would like to insinuate is by crossing out that
> sentence, that it is the equivalent of Mr. Thorne saying I was
> threatened, I was intimidated ….

(Pre._Tr._53.)

-45-

In fact, the district court admitted the draft declaration precisely *because of* what Thorne was allegedly asserting through his edits. Responding to Toyota's renewal of its objection at trial, the district court stated:

> Along with—to specifically note with regard to this document that's been in that's marked out, this goes directly to this case and what this man's beliefs were about what was going on, and the fact that he marked that out is relevant to the case. Now, he can explain it any way he wants to do that, but that is relevant evidence for this jury to be able to determine as to what exactly happened, and to keep that from the jury would be hiding the truth. It may be completely explainable, but it was written in there. It's not so much that it was written in there that's important, it's that he marked it out.

(Tr._399-400.)

Furthermore, Clark repeatedly argued to the jury that Thorne's deletions were assertions. In its opening statement, Clark's counsel showed the draft declaration to the jury, pointed to the portions Thorne deleted, and stated that "Cory Thorne removed these because they were inaccurate." (Tr._23.) And during its closing argument, Clark argued that Thorne *admitted* that Toyota intimidated and coerced him based on his deletions. (Tr._1407-11.) Indeed, Clark's attorney argued that, by his deletions, "Mr. Thorne is telling us that he believed that Toyota was trying to intimidate, threaten, and coerce him into dropping Clark." (Tr._1410.)

Because the draft declaration was admitted to show that, by deleting certain portions written by Toyota's attorneys, Thorne was asserting that he disagreed with

those written statements, the draft declaration is a "statement" for purposes of Rule 801.

*Second*, Clark used this out-of-court statement as evidence of the truth of the matter asserted, *i.e.*, that Thorne deleted the statements because they were supposedly untrue.  Clark's examination of Thorne confirms this, as Thorne was repeatedly asked if he deleted each statement "because it was not completely accurate."  (Tr._396-97; *see also* Tr._392-93 (asking Thorne if he edited the declaration "because it was inaccurate"); Tr._407-08 (asking Thorne if he "deleted [the statement] because you didn't feel it portrayed the way your conversation was"); Tr._534-35 (asking Thorne if deleted sections "were deleted by you because they weren't fully accurate").)

Therefore, because the draft declaration was an an out-of-court statement admitted for the truth of the matter asserted, it was hearsay as a matter of law.

## B.    Admission of this Inadmissible Hearsay Substantially Prejudiced Toyota.

Because the district court erred as a matter of law in concluding that the draft declaration was not hearsay, the Court should order a new trial based on the district court's abuse of discretion in admitting Thorne's draft declaration.  This Court must grant a new trial when an error in the admission of evidence affected the substantial rights of a party.  *See* 28 U.S.C. § 2111; Fed. R. Civ. P. 61.  An error is harmless only when "it can be said with a high probability that the error did

not affect the judgment." *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015); *see also Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (*en banc*) (holding that an error will be deemed harmless only if the appellate court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]" (internal quotation marks omitted) (brackets in original)). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Under this standard, Clark's repeated and emphatic reliance upon Thorne's draft declaration throughout trial—a reliance that was central to the most important issue in the case—substantially prejudiced Toyota and thus affected Toyota's substantial rights.

As shown, Clark relied upon Thorne's edits to the draft declaration during every phase of the trial: in its opening statement (Tr._23); during its examination of Thorne (*see, e.g.*, Tr._392-97, 534-35); and during its closing argument (Tr._1407-11, 1482-83). This extensive use certainly prejudiced Toyota. However, beyond Clark's repeated reliance on the draft declaration, the way in which Clark used the draft declaration proves that the prejudice to Toyota was *substantial*.

-48-

During Clark's direct examination, Thorne testified that Toyota never tried to threaten, intimidate, or coerce him into refusing to represent Clark. (Tr._390.) Clark then immediately pointed to Thorne's edits to the draft declaration, specifically Thorne's deletion of statements that Toyota did not try to threaten, coerce, or intimidate him at various different meetings. (Tr._391-397.) Rather than simply point out that Thorne deleted these statements, Clark repeatedly asked Thorne if he deleted these statements *because* they were not accurate. (Tr._393, 396-97.) On redirect, Clark again relied on the edits, asking "if you want to get the whole truth for what happened," then Thorne had to look at his edits to the draft declaration. (Tr._533-35.) And during closing argument, Clark stated that "during this June 29 call, Toyota executives tried to intimidate and coerce Mr. Thorne into dropping Clark. How do we know that? Because Mr. Thorne says so" in the deletions to the draft declaration. (Tr._1407.) Indeed, throughout its closing argument, Clark repeatedly pointed to the edits as *admissions* that Toyota did try to threaten, coerce, and intimidate Thorne. (Tr._1407-11.)

Whether Toyota did or did not try to threaten, coerce, or intimidate SIE was a *necessary* finding for each claim against Toyota submitted to the jury. (*See* Dkt._228; Tr._1512-18.) Evidence that the key individual in this case supposedly admitted that Toyota did threaten, coerce, and intimidate SIE was therefore highly prejudicial to Toyota and affected its substantial rights. *See Rosenfeld v. Basquiat*,

-49-

78 F.3d 84 (2d Cir. 1996) (holding that the erroneous admission of previous testimony of a witness concerning certain events was not harmless error when the central issue at trial was the veracity of the witness's version of those events). The admission of this hearsay necessitates a new trial on all issues.

### III. THE DISTRICT COURT'S JURY INSTRUCTION ON CLARK'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE INCORRECTLY STATED THE LAW.

Despite holding that a contract existed between Clark and SIE as a matter of law, the district court, over Toyota's objections (Tr._1496-97; Dkt._225), nonetheless allowed Clark to proceed on its claim for tortious interference with prospective economic advantage. Because the district court had already held that a valid contract existed, it instructed the jury that this claim was for any future economic advantage that flowed from this *existing* contract. This instruction was erroneous as a matter of law.

This Court reviews *de novo* whether jury instructions correctly state controlling law. *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 484 (4th Cir. 2007). An error in jury instructions requires reversal when the instructions, taken as a whole, do not accurately and adequately inform the jury of the controlling legal principles. *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 191 (4th Cir. 2003).

To establish a claim for tortious interference with prospective economic advantage under North Carolina law, "a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff, which would have been made absent the defendant's interference." *MLC Auto., LLC v. Town of S. Pines*, 207 N.C. App. 555, 571, 702 S.E.2d 68, 79 (2010). Central to this claim is whether "the contract would have ensued but for Defendants' interference." *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002). Indeed, in *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704 (2001), the North Carolina Supreme Court held that a claim for tortious interference with prospective economic advantage requires more than "an expectation of a continuing business relationship"; rather, it requires evidence that "but for [the defendant's] alleged interference a contract would have ensued." *Id.* at 655, 548 S.E.2d at 710.

The district court's jury instructions disregarded that, under North Carolina law, this tort is premised on tortious interference that induces a third party "to refrain from *entering* into a contract," *MLC Auto.*, 207 N.C. App. at 571, 702 S.E.2d at 79 (emphasis added). Instead, the district court instructed the jury that it could find for Clark based on an *already existing contract*. Indeed, at no point did the district court instruct that the jury was required to find that Toyota's conduct induced SIE *not* to enter into a contract:

> This means Clark must prove, by the greater weight of the evidence, five things…. One, the Clark—that the Clark/SIE contract conferred upon Clark some prospective contractual right or advantage it could have enforced against SIE. Two, Toyota knew of the contract. Three, Toyota maliciously induced SIE not to perform the contract. Four, Toyota acted without justification. And five, Toyota's conduct caused actual money damages to Clark.... Finally, as to the second issue on which Clark has the burden of proof, if you find by a preponderance of the evidence that Toyota wrongfully interfered with a valid contract between Clark and SIE that conferred a future economic advantage to Clark, and that such wrongful interference was a proximate cause of Clark's injuries and damages, then it would be your duty to answer this issue yes in favor of Clark.

(Tr._1515-16.)

These instructions—that the claim is based on a future economic advantage conferred by an *existing* "valid contract"—are completely contrary to law. Instead of requiring that the jury find that SIE and Clark would have entered into a *future contract*, the district court simply required the jury to find that the existing contract—which the court erroneously held was created as a matter of law—conferred some "future economic advantage to Clark." (Tr._1515-16.) The court therefore failed to correctly state the controlling legal principle for this claim—that Toyota's action induced Clark and SIE not to enter into a future contract.

Indeed, the district court's erroneous instructions were not even consistent with the instructions that Clark requested. In its proposed jury instructions submitted prior to trial, Clark used North Carolina Pattern Jury Instruction § 807.10 as the basis for its requested instruction. Specifically, Clark requested the

-52-

court to instruct that Clark must prove that "but for Toyota's conduct, Clark and SIE would have entered into a valid contract" and "that Toyota maliciously induced SIE not to enter into the prospective contract with Clark." (Dkt._200_at_25.)  These proposed instructions—unlike those given by the district court—correctly state the controlling legal principles for a claim for tortious interference with prospective economic advantage.

The district court's error can be demonstrated by comparing its instructions for tortious interference with contract with those for tortious interference with prospective economic advantage.  This comparison shows that the instructions are essentially identical:

| Instruction on Claim for Tortious Interference with Contract (Tr._1511-12) | Instruction on Claim for Tortious Interference with Prospective Economic Advantage (Tr._1515-16) |
|---|---|
| "This means Clark must prove by a preponderance of the evidence five things: | "This means Clark must prove, by the greater weight of the evidence, five things…. |
| "One, that a valid contract right existed between Clark and SIE.  And I have already determined this issue as a matter of law and that a contract did exist. | "One, the Clark – that the Clark/SIE contract conferred upon Clark some prospective contractual right or advantage it could have enforced against SIE. |
| "Two, that Toyota had knowledge of the facts giving rise to Clark's contract with SIE…. | "Two, Toyota knew of the contract. |
| "Three, that Toyota intentionally induced SIE not to perform or | "Three, Toyota maliciously induced SIE not to perform the contract. |

| | |
|---|---|
| intentionally induced SIE to terminate the contract right to which Clark was entitled. | |
| "Four, that Toyota acted without justification. | "Four, Toyota acted without justification. |
| "And five, that Toyota's actions resulted in money damages to Clark." | "And five, Toyota's conduct caused actual money damages to Clark." |

In essence, despite the significant differences between the two torts, the district court guaranteed that the jury would find for Clark on tortious interference with prospective economic advantage once it found for Clark on tortious interference with contract. This is inconsistent with North Carolina law.

The erroneous jury instructions plainly failed to accurately and adequately inform the jury of the controlling legal principles. *Rowland*, 340 F.3d at 191. At no point was the jury *ever* instructed that, to find for Clark, it must conclude that a future contract was not formed because of Toyota's actions. This means that the district court permitted the jury to award Clark damages for renewals of the Modified May 17 Draft, without ever requiring the jury to find that the parties in fact would have renewed the contract. Because the jury was never instructed to make this critical factual determination, a new trial is required. *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 236 (4th Cir. 2000) (ordering a retrial based on a district court's failure to ever instruct the jury on how to award interest).

Therefore, based on the district court's erroneous instructions, this Court

must remand for a new trial.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN ALLOWING SPECULATIVE, UNSUPPORTED DAMAGES PROJECTIONS CONTRARY TO RULE 702 AND *DAUBERT*.

In addition to the above errors of law, the district court also abused its

discretion when it permitted Clark's damages expert, Seth Palatnick, to opine on

the amount of damages Toyota allegedly caused Clark.  This Court reviews a trial

court's decision to admit or exclude expert testimony for an abuse of discretion.

*See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001).

Under Rule 702 of the Federal Rules of Evidence, a district court is required

to serve as the gatekeeper of expert opinions and prevent the jury from hearing

unreliable damages projections.  *Id.* at 199.  The party that offers an expert has the

burden to establish that the expert satisfied Rule 702.  *Id.*  The district court here

abused its discretion by allowing Palatnick to project damages of multi-millions of

dollars over an 11.5-year period, which then highly prejudiced Toyota.  This abuse

of discretion is apparent for two reasons.

*First*, the duration of Palatnik's projections was unsupported and

speculative.  Palatnick projected 11.5 years of damages even though the May 17

Draft only had a one-year term, did not automatically renew, and was terminable

upon merely 30-days' notice.  (Ex._365_at_7, 15.)  Palatnik is not an expert on

predicting the duration of forklift dealerships, and he did not analyze the number of Clark dealers who have left Clark since 2007 (25 in total), nor that five dealers that had joined Clark since 2008 had since departed, including one after just a single year. (Ex._410; Tr._953-55.) Further, it is undisputed that the average duration of new Clark dealerships since 2008 is only 2.2 years. (Ex._410.) There simply was no reliable factual basis for Palatnick's projection of damages for 11.5 years.

*Second*, the "data" used as part of Palatnick's 11.5 year projection was unreliable and speculative. Palatnik based his projections largely on Thorne's aspirational marketing plan (Tr._758, 797), a plan that was *not* based on data and which Thorne admitted was drafted specifically to market SIE to Clark. (Tr._472 ("Like I said, I was marketing to Clark…. Q. Did you have data to back it up? A. No, ma'am, I did not.").) Cory Thorne even admitted that he misled Clark with his projections, testifying that "I left it vague to try to entice Clark as much to want us as I did wanting them. So I probably did mislead them, yes." (Tr._470.)

Palatnik agreed that financial projections are only as good as the underlying data. (Tr._789-790.) Yet he based his projections on Thorne's *made-up* projections, and then went even further by creating his own numbers for use in his projections. For instance, he did not know whether SIE would have sold *any* units:

> Q.    Now you don't know whether Southeast would have sold a
>       single forklift in July, August, September, October, November,
>       December of a Clark Forklift, if it had been a Clark dealer,
>       true?

A.    This was a forecast that SIE developed.  So I didn't develop it. *This is what they said they would do and so I adopted that as accurate*.

(Tr._799 (emphasis added).)  Even Thorne did not project the unrealistic sales figures that Palatnik made up:

Q.    Did you know that—do you agree that in Mr. Thorne's Exhibit 19 presentation to Clark, he did not project that Clark would be selling 430 Clark trucks in the year 2023?

A.    That's correct.

Q.    He did not project that in 2015, Southeast would be selling 297 Clark trucks, but that's what shows up in your projection, correct?

A.    Correct.

Q.    Those are numbers that you came up with yourself, 297 in 2015, and 430 in 2023?

A.    Yes.

Q.    The highest number of Clark trucks that G&W had ever sold was 203, correct?

A.    I believe that's correct.

(Tr._818-19.)  Indeed, it is undisputed that Clark's prior dealer G&W—which was an award-winning Clark dealer who knew the products well—only sold an average of 123 units per year in the last five years.  (Tr._813.)  SIE did not even have a sales manager on board yet as of July 2012, and it would have taken significant time to build the separate sales force to sell Clark products.  (Tr._506, 800, 1115, 1207-08.)  Expert testimony based on sheer speculation is inadmissible.

*MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297, 307 (4th Cir. 2013) (vacating

damages and remanding for new trial on damages because district court abused its discretion by admitting expert testimony based on sheer speculation); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future ... prospects"); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142-43 (4th Cir. 1994) (district court abused its discretion by admitting baseless expert testimony).  Clark's damages expert was allowed to speculate, contrary to the mandates of Rule 702, *Daubert*, and this Court's precedent.

Moreover, Clark failed to support its expert's damages projection with evidence to a reasonable degree of certainty.  *See, e.g.*, *Western Insulation, LP v. Moore*, 242 F. App'x 112, 123-24 (4th Cir. 2007).  Palatnik never gave the required testimony that his opinions were offered with a reasonable degree of certainty.  *See Fontenot  v. Taser Int'l, Inc.*, 736 F.3d 318, 335 (4th Cir. 2013) (reversing remittitur that did not sufficiently reduce speculative compensatory damages, and ordering a new trial on damages; "we cannot agree that the evidence ... met the required 'reasonable level of certainty'").  Perhaps recognizing that the district court's instruction required damages to be based on reasonable certainty (Tr._1519), Clark's counsel tried to cure this error in closing argument, proclaiming that "Mr. Palatnik's analysis, using his damages model which *we*

-58-

*submit was done with reasonable certainty*, Clark's damages in this case are approximately $8 million …." (Tr._1428 (emphasis added).) But no such sworn testimony from Palatnik on reasonable certainty was ever provided, as Toyota emphasized when it renewed its motion to limit or exclude Palatnik. (Tr. _1497-98.)

*Finally*, the prejudice to Toyota from this inadmissible expert opinion is obvious. Palatnik was allowed to opine that Clark suffered over $8 million in damages from a one-year contract terminable on 30-days' notice. (Tr._776-77.) Indeed, in closing, Clark emphasized Palatnik's 11.5-year, *multi-million dollar* damages projections. (Tr._1426-28.) But all other evidence of damages suggested that they were limited *at most* to six figures. (Tr._908.) The jury then returned a *multi-million dollar* damages award against Toyota. A new trial on damages without Palatnik's inadmissible projections is therefore required.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment and remand this case for a new trial on all issues.

Respectfully submitted,

s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101

(336) 607-7382

Thurston H. Webb
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree St. NE
Suite 2800
Atlanta, GA 30309
(404) 815-4528

John R. Maley
BARNES &
  THORNBURG LLP
11 S. Meridian Street
Indianapolis, IN 46204
(317) 231-7464

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii) because this brief contains 13,768 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS Word 2010 in Times New Roman 14-point font.

This the 2nd day of October, 2015.

s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
    STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7382

*Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2015, I electronically filed the foregoing

**PAGE-PROOF BRIEF OF APPELLANT** with the Clerk of Court using the

CM/ECF System.  Counsel for all parties are registered CM/ECF users and will be

served with the foregoing document by the Court's CM/ECF System.


s/ Adam H. Charnes
Adam H. Charnes
KILPATRICK TOWNSEND &
 STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7382

*Counsel for Appellant*